**NOT YET SCHEDULED FOR ORAL ARGUMENT**

# United States Court of Appeals for the District of Columbia Circuit

## No. 26-7003

READE WHITNEY,

*Plaintiff-Appellant,*

*v.*

DC SOCCER, LLC,

*Defendant-Appellee.*

*On Appeal from the United States District Court for the District of Columbia in No. 1:23-cv-02988-AHA.*

# BRIEF OF PLAINTIFF-APPELLANT

MIKHAEL D. CHARNOFF
CHARNOFF SIMPSON PLLC
111 Church Street NW, Suite 202A
Vienna, Virginia 22180
(703) 291-6650
mike@charnoffsimpson.com

*Counsel for Plaintiff-Appellant*

May 11, 2026



COUNSEL PRESS    (800) 4-APPEAL • (814973)

**CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES**

**Parties:**

1.    Appellant Reade Whitney

2.    Appellee DC Soccer, LLC

**Rulings:**

The rulings under review are the District Court's Memorandum Opinion [ECF 21] dated January 7, 2026, and the District Court's Order [ECF 22] dated January 7, 2026, dismissing Appellant's Complaint.

**Related Cases:**

Appellant is not aware of any related cases.

**TABLE OF CONTENTS**

**Page:**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES.................i

TABLE OF CONTENTS ..................................................................................... ii

TABLE OF AUTHORITIES..............................................................................iv

INTRODUCTION .................................................................................................1

JURISDICTIONAL STATEMENT .....................................................................3

STATEMENT OF ISSUES ..................................................................................3

STATEMENT OF STATUTES AND RULES .....................................................4

STATEMENT OF THE CASE..............................................................................4

      A.     Reade Whitney enjoyed an unblemished reputation in his life as an athletic trainer for a professional sports team, with no hint of discrimination, or espousing racism, homophobia, or misogyny .........4

      B.     D.C. United, a professional sports team, publicly posted false and damaging statements about Reade Whitney ........................................6

      C.     Reade Whitney filed a Complaint, which the District Court dismissed ...............................................................................................12

SUMMARY OF THE ARGUMENT ..................................................................12

APPLICABLE STANDARD OF REVIEW ........................................................14

ARGUMENT ......................................................................................................15

      I.     THE COMPLAINT WAS ERRONEOUSLY DISMISSED ...............15

            A.     The applicable standard is a plausible claim for relief .............15

            B.     The choice of law favors applying Virginia law .......................16

C.   The statements pled in the Complaint are actionable under Virginia law ....................................................................18

D.   The statements are actionable under District of Columbia law .........................................................................29

E.   The comparable jurisprudence supports actionable defamation..............................................................35

CONCLUSION .....................................................................41

CERTIFICATE OF COMPLIANCE....................................................43

CERTIFICATE OF FILING AND SERVICE.......................................44

ADDENDUM

# TABLE OF AUTHORITIES

**Page(s):**

**Cases:**

*Armenta v. G/O Media, Inc.*,
No.: N24C-02-051 SPL, 2024 Del. Super. LEXIS 675
(Super. Ct. Oct. 7, 2024) ...............................................................38, 39, 40

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009).................................................................................15

*Barr v. Clinton*,
370 F.3d 1196 (D.C. Cir. 2004)........................................................16, 26

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007).................................................................................15

*Blodgett v. Univ. Club*,
930 A.2d 210 (2007) ...............................................................................17

*Bowman v. Iddon*,
848 F.3d 1034 (D.C. Cir. 2017) .............................................................15

*Cassirer v. Thyssen-Bornemisza Collection Found.*,
142 S. Ct. 1502 (2022).............................................................................16

*Chapin v. Knight–Ridder, Inc.*,
993 F.2d 1087 (4th Cir. 1993)................................................................20

*Cooper v. Templeton*,
629 F. Supp. 3d 223 (2022)..........................................................35, 36, 37

*Fairbanks v. Roller*,
314 F. Supp. 3d 85 (D.C. Cir. 2018) ........................... 13, 14, 33-35, 41

*Farina v. Sanders*,
2023 U.S. Dist. LEXIS 33203 (2023)......................................................17

*FDR Servs. Corp. of Va. v. District of Columbia*,
2023 U.S. Dist. LEXIS 127203 (2023).....................................................16

*Fleming v. Moore*,
    221 Va. 884 (1981)................................................................19, 27, 28

*Florio v. Gallaudet Univ.*,
    119 F.4th 67 (D.C. Cir. 2024) ........................... 2, 12, 13, 29-31, 33, 41

*Fuller v. Edwards*,
    180 Va. 191 (1942)......................................................................18

*Fuste v. Riverside Healthcare Ass'n*,
    265 Va. 127 (2003)......................................................................20

*Gibson Bros. v. Oberlin Coll.*,
    2022-Ohio-1079 (Ohio Ct. App. 2022)........................................37, 38

*Hettinga v. United States*,
    677 F.3d 471, 400 U.S. App. D.C. 218 (D.C. Cir. 2012)....................14

*Hughes v. Abell*,
    794 F. Supp. 2d 1 (D.D.C. 2010) ....................................................15

*Hurd v. District of Columbia*,
    864 F.3d 671 (D.C. Cir. 2017) .......................................................14

*Hyland v. Raytheon Tech. Servs. Co.*,
    277 Va. 40 (2009)........................................................................19

*Jordan v. Kollman*,
    269 Va. 569 (2005)......................................................................19

*Klaxon Co. v. Stentor Elec. Mfg. Co.*,
    313 U. S. 487, 61 S. Ct. 1020, 85 L. Ed. 1477 (1941) ......................16

*KLEO AG v. Rivada Networks, Inc.*,
    148 F.4th 741 (D.C. Cir. 2025) ......................................................14

*Kowal v. MCI Commc'ns. Corp.*,
    16 F3d 1271, 305 U.S. App. D.C. 60 (D.C. Cir. 1994) ......................16

*Milkovich v. Lorain Journal Co.*,
    497 U.S. 1 (1990).........................................................................40

v

*Moss v. Hardwood*,
    102 Va. 386 (1904)............................................................................20

*Norwich Pharms., Inc. v. Becerra*,
    2023 U.S. Dist. LEXIS 195879 (2023)...............................................15

*Perez v. Kipp DC Supporting Corp.*,
    70 F.4th 570 (2023)...........................................................................12

*Raytheon Tech. Servs. Co. v. Hyland*,
    273 Va. 292 (2007)........................................................................22, 40

*Schaecher v. Bouffault*,
    290 Va. 83 (2015)..............................................................................18

*Schuler v. United States*,
    617 F.2d 605, 199 U.S. App. D.C. 23 (D.C. Cir. 1979).......................14

*Steele v. United States*,
    144 F.4th 316 (D.C. Cir. 2025) ........................................................14

*Steinhilber v. Alphonse*,
    68 N.Y.2d 283 (1986)........................................................................37

*Tharpe v. Saunders*,
    285 Va. 476 (2013)........................................................................18, 19

*Tronfeld v. Nationwide Mut. Ins. Co.*,
    272 Va. 709 (2006)............................................................................19

*Washkoviak v. Sallie Mae*,
    2006 D.C. App. LEXIS 300 (2006) ...................................................17

*White v. Fraternal Ord. of Police*,
    909 F.2d 512, 285 U.S. App. D.C. 273 (D.C. Cir. 1990)....................40

*Williams v. Garraghty*,
    249 Va. 224 (1995)........................................................................22, 40

**Statutes and Other Authorities:**

28 U.S.C. § 1291 ....................................................................................................3

28 U.S.C. § 1332 ....................................................................................................3

D.C. Cir. R. 28(a)(5) ............................................................................................4

Fed. R. App. P. 28(f) ...........................................................................................4

Fed. R. Civ. P. 12(b) .........................................................................................12

Fed. R. Civ. P. 12(b)(6) ...............................................................................14, 15

Restatement (Second) of Torts § 559 ................................................................20

**INTRODUCTION**

Defamation is one of the oldest recognized causes action, predating the United States Constitution by several decades, with roots in Roman and English common law.  Notwithstanding the robust jurisprudence developed over the years, the cause of action itself is simple.  Publishing a false and prejudicial statement to third parties can cause devastating and irrevocable reputational harm.  That is especially true where a false statement is made prejudicing one's profession or trade, suggesting an unfitness to perform the duties of employment.

Reade Whitney is a highly trained, experienced, and successful professional athletic trainer.  He is licensed by the Commonwealth of Virginia, holds seven private licenses and certifications, and had worked for professional soccer teams since 2013.  A majority of the athletes that he worked with on a day-to-day basis, providing hands on care, therapy, and nutritional and exercise advice, were racial minorities.  Through mid-July of 2023, at the age of 37, he was enjoying his trade and profession and looking forward to another three decades of professional level athletic training in soccer.  Then he posed for a staff group photo on July 18, 2023.

Appellee DC SOCCER, LLC (hereafter D.C. United), the Defendant in the dismissed suit, destroyed Reade Whitney's reputation on July 21, 2023, at 7:30 p.m., when it issued a public "DC United Club Statement" on their website and social media platforms:

1

D.C. United have terminated the employment of the club's athletic trainer effective immediately. This termination is the result of an internal review following the discovery of a discriminatory hand gesture made by the individual that surfaced in a photograph published across social media platforms on July 20, 2023. There is no place for racism, homophobia, misogyny, or discrimination of any kind in our sport world and D.C. United do not tolerate any acts of this nature.

Reade Whitney provably did not make any discriminatory hand gesture, so the statement was false. The staff photograph taken and published by D.C. United literally showed no discriminatory hand gesture. Reade Whitney had not raised, much less promoted, racism, homophobia, or misogyny. This was provable.

Media identified Reade Whitney less than two hours after the publication of D.C. United's statement, and the published statement went viral on local news, national news, international news, and the internet. Scores of public comments appended to the Washington Post article accepted and discussed Reade Whitney's purported racism. His professional and personal reputation was deeply and irrevocably damaged by morning.

The District Court did not find an adequately stated defamation claim, concluded that statements were protected opinions, concluded that statements were opinions and not factual statements, and concluded that statements were not actionable opinions which implied a provably false fact. The District Court, in part by misconstruing this Court's recent decision in *Florio v. Gallaudet Univ.*, 119 F.4th 67, 70 (2024), which is clearly distinguishable, incorrectly dismissed the case.

## JURISDICTIONAL STATEMENT

The District Court (Hon. Amir H. Ali) had diversity jurisdiction pursuant to 28 U.S.C. § 1332.  Plaintiff Reade Whitney appeals from the January 7, 2026, Order granting Defendant's Second Motion to Dismiss Plaintiff's Complaint, as discussed in the Memorandum Opinion of the same date.  The Order disposed of all parties' claims.  A Notice of Appeal was timely filed on January 20, 2026.  This Court has jurisdiction pursuant to 28 U.S.C. § 1291 as the Order was a final decision of a District Court.

## STATEMENT OF ISSUES

1.    Did the District Court err by granting the Second Motion to Dismiss, dismissing Appellant's Complaint?    (Yes)

2.    Did the District Court err by concluding that Appellant had not plausibly and adequately stated a defamation claim?    (Yes)

3.    Did the District Court err by concluding that the statements were protected opinions?    (Yes)

4.    Did the District Court err by concluding that the statements were opinions and not factual statements?    (Yes)

5.    Did the District Court err by concluding that the statements were not actionable opinions which implied a provably false fact?    (Yes)

3

## STATEMENT OF STATUTES AND RULES

Pursuant to Rule 28(f), Federal Rules of Appellate Procedure, and Circuit Rule 28(a)(5), the pertinent statutes and rules are set forth in the Addendum to this brief.

## STATEMENT OF THE CASE

**A.     Reade Whitney enjoyed an unblemished reputation in his life as an athletic trainer for a professional sports team, with no hint of discrimination, or espousing racism, homophobia, or misogyny.**

Reade Whitney holds a Bachelor of Science degree in Athletic Training as of 2008. JA6. He holds a Master of Science degree in Kinesiology and Rehabilitation Science in Athletic Training as of 2011. JA6. He is licensed by the Commonwealth of Virginia as an athletic trainer. JA6. He holds seven private licenses and certifications earned between 2008 and 2021 in athletic training and sports medicine. JA6. He has been employed as a professional athletic trainer since 2008. JA6. He has been employed as a professional soccer athletic trainer since 2013. JA6. He has worked for professional soccer teams since 2013. JA6.

Reade Whitney has worked in Major League Soccer with FC Dallas, Chicago Fire FC, and CF Montreal. JA7. He chose to dedicate his life to working in the most diverse professional sports league in North America. JA7. Approximately 24% of Major League Soccer players are Black or African American. JA7. Approximately 31% of Major League Soccer players are Hispanic or Latino. JA7.

4

DC Soccer, LLC, doing business as the Major League Soccer club D.C. United, hired Reade Whitney in July of 2021 as an Assistant Athletic Trainer. JA7. His tenure as an Assistant Athletic Trainer at D.C. United was successful in every respect. JA7. D.C. United promoted him in January of 2022 to serve as Head Athletic Trainer. His tenure as Head Athletic Trainer at D.C. United was successful in every respect through mid-July of 2023. JA7. He enjoyed a reputation as an excellent, inclusive, and professional soccer athletic trainer with the players and staff of D.C. United. JA7.

Reade Whitney has no history of racist conduct. JA14. He has no history of racist associations. JA14. He has no history of racist readings or writings. JA14. He has no history of white supremacist conduct. JA14. He has no history of white supremacist associations. JA14. He has no history of white supremacist readings or writings. JA14. Reade Whitney's wife is not white. JA14.

Reade Whitney has never engaged in discriminatory acts, has never supported discriminatory acts, and is an avowed lifelong anti-racist. JA15.

Reade Whitney has never supported homophobia. JA15. The OK hand gesture is not known to be associated with homophobia. JA15.

Reade Whitney has never supported misogyny. JA15. The OK hand gesture is not known to be associated with misogyny. JA15.

5

The hand gesture used by Reade Whitney in the staff photograph from July 2023 is literally not the traditional OK gesture.  JA14.  Instead, it was an upside-down and backwards gesture.  JA14.  The hand gesture in the staff photograph was specifically held below the waist, which is consistent with the decades old Circle Game.  JA14.

**B.    D.C. United, a professional sports team, publicly posted false and damaging statements about Reade Whitney.**

Appellee published a public "DC United Club Statement" on their website and social media platforms on July 20, 2023, at 7:30 p.m.:

> D.C. United have terminated the employment of the club's athletic trainer effective immediately. This termination is the result of an internal review following the discovery of a discriminatory hand gesture made by the individual that surfaced in a photograph published across social media platforms on July 20, 2023.  There is no place for racism, homophobia, misogyny, or discrimination of any kind in our sport world and D.C. United do not tolerate any acts of this nature.

JA9-10.

The reference to "the club's athletic trainer" could not reasonably refer to anyone other than Reade Whitney, and the Washington Post identified the "club's athletic trainer" as Reade Whitney less than two hours after the publication of the statement, in an article published at 9:09 p.m.[1]  JA11.  The published statement went

---

[1] https://www.washingtonpost.com/sports/2023/07/21/dc-united-fires-trainer-gesture/

viral on local news, national news, international news, and the internet, including articles by National Public Radio, the BBC, and Associated Press.  JA11.

Public comments appended to the Washington Post article accepted and discussed Reade Whitney's purported discrimination and racism, including, "Presumably the league looked into it and found enough evidence to believe he did it and knew what it meant"; "Wow, there sure are a lot of people here being VERY offended that a racist got called out for being a racist"; "It's your intention that matters. DC United most likely had other indications of this man's intentions. Most innocent folks like yourself have no idea that the sign for ok has been corrupted for a racist trope. Used in an innocent context its taken in an innocent context. 100 bucks says this coach had other marks against him."; "Nobody fire somebody for making the OK sign. It had to be the last straw for this guy and he didn't mean it to mean OK."; "He should call himself Reade Whiteney!"; "(He knew what he was doing and still did it. Now go apply for Qanon's trainer opening.)"; "What could the OK symbol represent in that context other than as a White Power symbol?"; "Glad they fired him on the spot.  Hope his future job prospects dry up."; "This is people taking action on improper actions. It is exactly correct. Should they investigate him? No. Release of duties is enough. Next person may think twice before doing this and keep their evil thoughts in their head."  JA11.  Internet searches of Reade Whitney's name after July 21, 2023, overwhelmingly link to the published statement and related news stories.  JA11.

Reade Whitney did not make any discriminatory hand gesture, such that the publication was false.  JA12.  He had never in any way raised, embraced, or promoted racism, homophobia, misogyny.  JA12-15.

As published and maintained by the Anti-Defamation League, "The 'okay' hand gesture—in which the thumb and index finger touch while the other fingers of the hand are held outstretched—is an obvious and ancient gesture that has arisen in many cultures over the years with different meanings."  JA12.  According to the Anti-Defamation League, "Today, in a usage that dates to at least as early as 17th century Great Britain, it most commonly signals understanding, consent, approval or well-being."  JA12.  According to the Anti-Defamation League, "Since the early 1800s, the gesture increasingly became associated with the word 'okay' and its abbreviation 'ok.'"  JA13.

According to the Anti-Defamation League, "The gesture is also important in the Hindu and Buddhist worlds, as well as in yoga, where it is known as mudra or vitarka mudra, a symbol of inner perfection."  JA13.  According to the Anti-Defamation League, "The 'okay' hand gesture also forms part of the basis for a number of words or concepts in American Sign Language."  JA13.  According to, "Use of the okay symbol in most contexts is entirely innocuous and harmless."  JA13.

8

According to the Anti-Defamation League, sometime in 2017 the okay hand gesture was given a new meaning as part of a hoax by white supremacists who joked that the hand gesture represented the letters WP to signify "white power."  JA13. According to the Anti-Defamation League, by 2019 some white supremacists abandoned this satirical use of the okay gesture and began to use it without irony, leading the Anti-Defamation League to identify the hand gesture as a potential hate symbol.  JA13.  Nevertheless, according to the Anti-Defamation League, because of the obscurity and newness of this alternative meaning:

> The overwhelming usage of the "okay" hand gesture today is still its traditional purpose as a gesture signifying assent or approval. As a result, someone who uses the symbol cannot be assumed to be using the symbol in either a trolling or, especially, white supremacist context unless other contextual evidence exists to support the contention. Since 2017, many people have been falsely accused of being racist or white supremacist for using the "okay" gesture in its traditional and innocuous sense.

JA13.

According to the Anti-Defamation League, "Other, similar-seeming hand gestures have also been mistakenly assumed to have white supremacist connotations as a result of the 'okay' hoax.  One of these is the so-called 'Circle Game,' in which people attempt to trick each other into looking at an okay-like hand gesture made somewhere below the waist."  JA14.  Reade Whitney had been playing the Circle Game in the photograph, which is a schoolyard game dating back to at least the 1970s that involves the upside-down okay hand gesture held below waist level.

9

JA14.  If someone else looks directly at the hand gesture, the "circler" wins and is entitled to punch that person in the arm.  JA14.  The Circle Game gesture is regularly used to photobomb otherwise serious photographs.  JA14.

The hand gesture used by Reade Whitney in the photograph is literally not the traditional OK gesture that could, as of 2019, be obscurely construed as standing for white power but was instead an upside-down and backwards gesture.  JA14.

D.C. United did not conduct any kind of remotely legitimate, thorough, or good faith investigation in less than two hours on a Friday evening.  JA15.  D.C. United could not identify any evidence whatsoever from any interviews in that limited window that Reade Whitney had any racist, white power, or discriminatory background or intent.   JA15. D.C. United could not identify any evidence whatsoever from any interviews in that limited window that Reade Whitney had made a discriminatory hand gesture.  JA15.

A simple Google search would have revealed that the Anti-Defamation League warns that the use of the OK symbol in most contexts is entirely innocuous and harmless.  JA16.  A simple Google search would have revealed that the U.S. Military Academy at West Point and the Naval Academy each conducted a several day investigation of cadets seen using the OK hand gesture at an Army-Navy football game and each concluded that it was just the Circle Game.  JA16.  A simple Google search would have revealed that D.C. Fire and EMS had conducted a two-week

10

investigation of recruits photographed using the OK hand gesture and concluded that it was just the Circle Game.  JA16.  At minimum, D.C. United failed under the circumstances to take care that its statements about Reade Whitney were true.  JA16.

D.C. United has forever falsely linked Reade Whitney to "racism, homophobia, misogyny, [and] discrimination."  JA16.  D.C. United has destroyed Reade Whitney's reputation in his community of professional soccer through their false publications.  JA16.  D.C. United has destroyed Reade Whitney's ability to earn a living in his given trade and profession of athletic training.  JA16.  D.C. United has destroyed Reade Whitney's ability to earn a living in any trade or profession, as a Google search by any potential employer will link him to these false claims.  JA16.

Reade Whitney is emotionally distraught over his destroyed reputation.  JA17. He is embarrassed and humiliated over his destroyed reputation.  JA17.  He is mortified that any of the hundreds of athletes of color that he has worked with personally over the years may now believe that he was harboring hateful, racist, or discriminatory thoughts. JA17.  He is mortified that any of his friends and coworkers in the LGBTQIA+ community may now believe that he was harboring hateful, homophobic, or discriminatory thoughts.  JA17.  He is mortified that any of his women friends and coworkers may now believe that he was harboring hateful, misogynistic, or discriminatory thoughts.

11

> **C.    Reade Whitney filed a Complaint, which the District Court dismissed.**

The Complaint was filed on October 6, 2023.  JA1, 5-23.  D.C. United filed a Motion to Dismiss on November 2, 2023.  JA2.  Appellant filed an Opposition on November 16, 2023.  JA2.  D.C. United filed a Reply on December 8, 2023.  JA2.  Through a Joint Status Report, both parties advised the Court that the United States Court of Appeals for the D.C. Circuit published its decision in *Florio v. Gallaudet University*, 119 F.4th 67, 70 (D.C. Cir. 2024), on October 4, 2024.  JA3.

On October 10, 2024, the District Court denied the original motion to dismiss as moot and proposed a briefing schedule for any renewed 12(b) motion.  JA3.  D.C. United filed a Second Motion to Dismiss on November 15, 2024.  JA3, 24-43.  Appellant filed an Opposition on December 16, 2024.  JA3, 44-75.  D.C. United filed a Reply on January 10, 2025.  JA3, 76-85.

The matter was fully briefed as of January 10, 2025.  Almost one year later, on January 7, 2026, the District Court dismissed Reade Whitney's case.  JA4, 86-96.  "[A] dismissal without prejudice is appealable as a final order."  *Perez v. Kipp DC Supporting Corp.*, 70 F.4th 570, 572 (2023).

## SUMMARY OF THE ARGUMENT

The District Court erred by dismissing the well-pled Complaint filed by Reade Whitney.  The Complaint plausibly and more than adequately stated a defamation claim, whether considered under Virginia law, District of Columbia law, or the law

12

of any other jurisdiction considered by the District Court.  The District Court erred by concluding that D.C. United's statements were protected opinions, that they were opinions and not factual statements, and that they were not actionable opinions which implied a provably false fact.

Defamation requires a false statement.  As pled, Reade Whitney simply did not make a discriminatory gesture that D.C. United could have "discovered" and then published about.

Nor was there even a nominal gesture or word conveyed by Reade Whitney as to homophobia.  Nor was there even a nominal gesture or word conveyed by Reade Whitney as to misogyny.  These are all completely groundless accusations.

The District Court was ultimately led astray by the different facts present and specific claims made in *Florio*, a case which ultimately does not serve to undermine Reade Whitney's straightforward claims of defamation.  While *Florio* involved a comparison between a Bellamy salute and a Nazi salute, identical to one another, the well-pled facts here are clearly distinguishable.  Here, the OK sign was upside down, backwards, and below the waist instead of held at chest or eye level.  Objectively there was never a discriminatory gesture made by Reade Whitney in the staff photo. No fact witness or expert witness could ever testify to the contrary.

This Court's logic and reasoning in *Fairbanks v. Roller*, 314 F. Supp. 3d 85 (D.C. Cir. 2018) demonstrates why the Complaint pleads prima facie claims of

13

defamation, because "views and attitudes are subjective realities while physical gestures are objective realities." *Id*. 91.  As this Court explained

> a defendant might claim that the plaintiff 'flipped me off' when the evidence showed the plaintiff actually gave a thumbs-up, or a defendant might claim that the plaintiff performed the Nazi salute when the plaintiff merely waved hello.  These demonstrably false factual statements would differ from related, but protected, statements of opinion….

*Id*.  Applying and harmonizing these cases leads to reversal of the dismissal.

## APPLICABLE STANDARD OF REVIEW

The dismissal of a Complaint by a District Court on a Rule 12(b)(6) motion to dismiss is reviewed *de novo*.  *Hurd v. District of Columbia*, 864 F.3d 671, 678 (D.C. Cir. 2017).  A *de novo* review is the default rule in this posture.  *Steele v. United States*, 144 F.4th 316, 325 (D.C. Cir. 2025).

This Court recently reviewed the dismissal of a defamation complaint *de novo*, and endeavored to "construe the complaint in favor of the plaintiff, who must be granted the benefit of all inferences that can be derived from the facts alleged.'" *KLEO AG v. Rivada Networks, Inc*., 148 F.4th 741, 745 (D.C. Cir. 2025) (citing *Hettinga v. United States*, 677 F.3d 471, 476, 400 U.S. App. D.C. 218 (D.C. Cir. 2012) (per curiam) (quoting *Schuler v. United States*, 617 F.2d 605, 608, 199 U.S. App. D.C. 23 (D.C. Cir. 1979)).

14

## ARGUMENT

## I.    THE COMPLAINT WAS ERRONEOUSLY DISMISSED

### A.    The applicable standard is a plausible claim for relief.

The District Court erred by granting the Second Motion to Dismiss, dismissing Appellant's Complaint.  The District Court was required to apply Rule 12(b)(6) of the Federal Rules of Civil Procedure and the well-established jurisprudence that has developed around it.

> To survive a motion to dismiss under Rule 12(b)(6), a complaint must set forth "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009). When considering a Rule 12(b)(6) motion, we "accept[] as true all of the factual allegations contained in the complaint and draw[] all inferences in favor of the nonmoving party." Autor v. Pritzker, 740 F.3d 176, 179, 408 U.S. App. D.C. 42 (D.C. Cir. 2014) (citation and internal quotation marks omitted).

*Bowman v. Iddon*, 848 F.3d 1034, 1039 (D.C. Cir. 2017).  The District Court only needed to take note of the required elements of the cause of action and whether some factual support for them has been pled in the four corners of the Complaint.  *See Norwich Pharms., Inc. v. Becerra*, 2023 U.S. Dist. LEXIS 195879, *26.

A plaintiff only fails to state a claim if he does not plead a plausible claim for relief based on allegations that are entitled to the assumption of truth.  *See Ashcroft v. Iqbal*, 556 U.S. 662 (2009).  Even post-*Iqbal* and *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007), "[t]he notice pleading rules are not meant to impose a great burden on a plaintiff."  *Hughes v. Abell*, 794 F. Supp. 2d 1, 6 (D.D.C. 2010).

15

Under this Court's jurisprudence, a complaint is to be construed "liberally" and in the plaintiff's favor.  *Barr v. Clinton*, 370 F.3d 1196, 1199 (D.C. Cir. 2004).  "The Court must grant the plaintiff 'the benefit of all inferences that can be derived from the facts alleged,' but the Court need not 'accept legal conclusions cast in the form of factual allegations.' *Kowal v. MCI Commc'ns. Corp.*, 16 F3d 1271, 1276, 305 U.S. App. D.C. 60 (D.C. Cir. 1994)."  *FDR Servs. Corp. of Va. v. District of Columbia*, 2023 U.S. Dist. LEXIS 127203, *2-3.

The District Court here found that Reade Whitney has not stated a defamation claim, and specifically that there was a failure to allege a provably false statement.  JA89.  More specifically, the District Court decided that "D.C. United's statement is nonactionable opinion about whether Whitney made a discriminatory gesture."  JA90.  Respectfully, the District Court is wrong.

## B.    The choice of law favors applying Virginia law.

The District Court ultimately elected to apply District of Columbia law.  "According to long-settled precedent, a federal court sitting in diversity borrows the forum State's choice-of-law rule.  *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U. S. 487, 496, 61 S. Ct. 1020, 85 L. Ed. 1477 (1941)."  *Cassirer v. Thyssen-Bornemisza Collection Found.*, 142 S. Ct. 1502, 1509 (2022).  Here, that is the District of Columbia.

> The District of Columbia uses a choice-of-law scheme called modified-government-interest analysis. *See Danziger v. Ford Motor Co.*, 402 F.

16

Supp. 2d 236, 239 (D.D.C. 2005); *Washkoviak v. Sallie Mae*, 900 A.2d 168, 180 (D.C. 2006). Like traditional government interest analysis, the method seeks to apply the law of the jurisdiction most interested in a particular issue.

*Farina v. Sanders*, 2023 U.S. Dist. LEXIS 33203, *10 (2023).

Under this scheme, the court must first determine whether there is a conflict of the laws of the competing jurisdictions. *Id*. If there is none, the forum law is applied. If there is a conflict, the trial court must then determine which jurisdiction has the most significant relationship to the dispute by considering four factors:

a) the place where the injury occurred;
b) the place where the conduct causing the injury occurred;
c) the domicile, residence, nationality, place of incorporation and place of business of the parties; and
d) the place where the relationship is centered.

*See Washkoviak v. Sallie Mae*, 2006 D.C. App. LEXIS 300, *30.

As argued to the District Court, the law of defamation in the District of Columbia and Virginia are similar but not identical. Pursuant to the law of the District of Columbia, the elements of defamation are (1) that the defendant made a false and defamatory statement concerning the plaintiff; (2) that the defendant published the statement without privilege to a third party; (3) that the defendant's fault in publishing the statement amounted to at least negligence; and (4) either that the statement was actionable as a matter of law, irrespective of special harm, or that its publication caused the plaintiff special harm. *Blodgett v. Univ. Club*, 930 A.2d 210, 222 (2007).

17

The elements of defamation in Virginia are "(1) publication of (2) an actionable statement with (3) the requisite intent." *Schaecher v. Bouffault*, 290 Va. 83, 91 (2015) (quoting *Tharpe v. Saunders*, 285 Va. 476, 480 (2013)).

To the extent a conflict exists, Appellant filed suit as a resident of Virginia, he suffered greatest injury in Virginia, and he is licensed by the Commonwealth of Virginia as an athletic trainer, his given profession. JA4, 19. Moreover, although D.C. United plays approximately 17 home league games a year in the District of Columbia, the players and staff spend most of their time in Virginia. JA51. Thus, Virginia law likely applies. Nevertheless, the Second Motion to Dismiss should have been denied whether applying Virginia law or District of Columbia law.

**C.     The statements pled in the Complaint are actionable under Virginia law.**

The Supreme Court of Virginia held over 80 years ago, and has consistently since reaffirmed, that one has a right to an unimpaired reputation, and "an impaired reputation is at times more disastrous than a broken leg. Any violation of these inherent and common rights is an injury to the person for which compensation will lie, either at law or in equity." *Fuller v. Edwards*, 180 Va. 191, 198 (1942). Defamation is not an academic or trifling injury, but a fundamental one.

In Virginia, defamation is shown by a simple preponderance of evidence that the defendant published a statement, that the statement was about the plaintiff, that the statement was made to someone other than the plaintiff, that the statement was

false, and that the defendant knew the statement was false or was negligent in ascertaining the facts alleged in the publication. *See e.g. Jordan v. Kollman*, 269 Va. 569, 575 (2005). An "actionable" statement is both false and defamatory. *Tharpe*, 285 Va. at 481.

Furthermore, "[d]efamatory words that cause prejudice to a person in her profession are actionable as defamation per se." *Hyland v. Raytheon Tech. Servs. Co.*, 277 Va. 40, 46 (2009) (citations omitted). "Defamatory statements may include statements made by inference, implication, or insinuation." *Id.* at 47. Defamatory words that are actionable per se are:

> 1) Those which impute to a person the commission of some criminal offense involving moral turpitude, for which the party, if the charge is true, may be indicted and punished.
>
> (2) Those which impute that a person is infected with some contagious disease, where if the charge is true, it would exclude the party from society.
>
> (3) Those which impute to a person unfitness to perform the duties of an office or employment of profit, or want of integrity in the discharge of the duties of such an office or employment.
>
> (4) Those which prejudice such person in his or her profession or trade.

*Tronfeld v. Nationwide Mut. Ins. Co.*, 272 Va. 709, 713 (2006) (quoting *Fleming v. Moore*, 221 Va. 884, 889 (1981)).

Defamatory words are those "tend[ing] so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from

associating or dealing with him." *Chapin v. Knight–Ridder, Inc.*, 993 F.2d 1087, 1092 (4th Cir. 1993) (citing the Restatement (Second) of Torts § 559 and applying Virginia law). When characterizing the level of harm to plaintiff's reputation required for defamatory "sting," the Supreme Court of Virginia has explained:

> any publication, expressed either by printing or writing, or by signs, pictures, or effigies, or the like, which tends to injure one's reputation in the common estimation of mankind, to throw contumely, shame, or disgrace upon him, or which tends to hold him up to scorn, ridicule, or contempt, or which is calculated to render him infamous, odious, or ridiculous, is prima facie a libel, and implies malice in its publication.

*Moss v. Hardwood*, 102 Va. 386, 392 (1904).

Moreover, to the extent defamation must be pled in Virginia using the exact words spoken – in haec verba – the Complaint does so thoroughly. *See Fuste v. Riverside Healthcare Ass'n*, 265 Va. 127, 134 (2003). Paragraph 48 of the Complaint expressly sets out the distinct and verbatim quotations from Defendant's press release, and an image of the press release is included in Paragraph 49 of the Complaint.

> D.C. United have terminated the employment of the club's athletic trainer effective immediately. This termination is the result of an internal review following the discovery of a discriminatory hand gesture made by the individual that surfaced in a photograph published across social media platforms on July 20, 2023. There is no place for racism, homophobia, misogyny, or discrimination of any kind in our sport world and D.C. United do not tolerate any acts of this nature.

JA10.

20

D.C. United published on Friday, July 21 at 7:30 p.m. a "DC United Club Statement" on its website and social media platforms. JA9-10. The reference to "the club's athletic trainer" could not reasonably refer to anyone other than Reade Whitney. JA11. The Washington Post identified the "club's athletic trainer" as Reade Whitney less than two hours after the publication of the defamatory statement. JA11.

D.C. United broadly argued in their Second Motion to Dismiss that the statements in the publication are merely opinions, and therefore not actionable. Pure statements of opinion cannot be true or false by their nature. But the statements here are not opinions. "This termination is the result of an internal review following the discovery of a discriminatory hand gesture made by the individual that surfaced in a photograph published across social media platforms on July 20, 2023." The statement was not that an ambiguous hand gesture had been made. The statement was not that a discriminatory hand gesture might have been made. The statement was not that, in the opinion of D.C. United, that a discriminatory hand gesture was made. Whether a discriminatory hand gesture was made by Reade Whitney in a photo is either true or false. Here it is false.

Moreover, while pure expressions of opinion are not actionable, "[f]actual statements made to support or justify an opinion […] can form the basis of an action

21

for defamation." *Williams v. Garraghty*, 249 Va. 224, 233 (1995). Furthermore, opinions themselves are actionable where they can imply objective facts.

> As the United States Supreme Court noted in *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 110 S. Ct. 2695, 111 L. Ed. 2d 1 (1990), "expressions of 'opinion' may often imply an assertion of objective fact." *Id.* at 18. The Supreme Court went on to state, "[s]imply couching . . . statements in terms of opinion does not dispel these implications." *Id.* at 19. Accordingly, the Supreme Court refused to "create a wholesale defamation exemption for anything that might be labeled 'opinion,'" *id.* at 18, instead holding that opinions may be actionable where they "imply an assertion" of objective fact.

*Raytheon Tech. Servs. Co. v. Hyland*, 273 Va. 292, 303 (2007).

Here, the second sentence of the published statement expressly claimed that "an internal review" was performed. And the statement mentioned the "discovery" of a discriminatory hand gesture. These were all factual assertions which gave rise to the inference that there were undisclosed facts that justified the assertion. D.C. United publicly communicated to the world that some sort of investigation was conducted which resulted in termination of employment, and that they affirmatively discovered that Reade Whitney had made a discriminatory hand gesture. Either he did or he did not.

Moreover, as evident from the record, the statement did not include a photo of the hand signal that could be interpreted as opinion. JA10. Readers of the published statement could only understand it and believe that a discriminatory hand signal was made.

22

The Complaint squarely, clearly, and extensively alleges facts showing that Reade Whitney did not make a discriminatory hand gesture.  He had no knowledge of any such discriminatory association with the hand gesture he was photographed making.  Complaint ¶¶ 36, 40, 41, JA9.  The Complaint squarely alleges that "[t]he hand gesture used by Reade Whitney in the photograph is literally not the traditional OK gesture that could, as of 2019, be obscurely construed as standing for white power but was instead an upside-down and backwards gesture."  Complaint ¶ 78, JA14.  "The hand gesture used by Reade Whitney in the photograph was specifically held below the waist, which is consistent with the decades old Circle Game."  Complaint ¶ 79, JA14.  These are all allegations of fact.  The District Court erred by not accepting them as such.

The Complaint also more than sufficiently alleges facts, for example in Paragraphs 53 to 58, that show that the public understood Defendant's statements as having some sort of factual support:

- Comments from the Washington Post article included, "Presumably the league looked into it and found enough evidence to believe he did it and knew what it meant."  Complaint ¶ 53, JA11.

- Comments from the Washington Post article included, "Wow, there sure are a lot of people here being VERY offended that a racist got called out for being a racist."  Complaint ¶ 54, JA11.

- Comments from the Washington Post article included, "It's your intention that matters. DC United most likely had other indications of this man's intentions. Most innocent folks like yourself have no idea that the sign for ok has been corrupted for a racist trope. Used in an innocent context its taken in an

23

innocent context. 100 bucks says this coach had other marks against him." Complaint ¶ 55, JA11.

- Comments from the Washington Post article included, "Nobody fire somebody for making the OK sign. It had to be the last straw for this guy and he didn't mean it to mean OK." Complaint ¶ 56, JA11.

- Comments from the Washington Post article included, "He should call himself Reade Whiteney!" Complaint ¶ 57, JA11.

- Comments from the Washington Post article included, "(He knew what he was doing and still did it. Now go apply for Qanon's trainer opening.)" Complaint ¶ 58, JA11.

Therefore, even if the District Court could find that the "discriminatory hand gesture" statement was somehow a pure opinion, it is still actionable as a matter of law because it does give rise to the inference that there are undisclosed facts which justify the forming of an opinion expressed by D.C. United.

The third sentence by D.C. United in the club statement regarding Reade Whitney, entitled "D.C. United Terminate Employment of Club Athletic Trainer Effective Immediately," is that "[t]here is no place for racism, homophobia, misogyny, or discrimination of any kind in our sport world…." This sentence falsely and directly implied that Reade Whitney was associated with or supported racism, homophobia, misogyny, and discrimination. As explained above, each of these are assertions which give rise to the inference that there are undisclosed, objective facts which justify the forming of the opinion expressed by D.C. United.

Furthermore, the Second Motion to Dismiss completely failed to address the statements about homophobia and misogyny. D.C. United literally did not have any basis to publish a statement associating Plaintiff with homophobia, which may be manifested in discrimination, hostile behavior, or hate crimes. "The actual upright OK hand gesture, even when construed in the obscure, new, and alternative meaning, is not known to be associated with homophobia." Complaint ¶ 87, JA15. "Reade Whitney has never supported homophobia." Complaint ¶ 88, JA15. "Reade Whitney is mortified that any of his friends and coworkers in the LGBTQIA+ community may now believe that he was harboring hateful, homophobic, or discriminatory thoughts." Complaint ¶ 114, JA17. Assertions which give rise to the inference that there are undisclosed facts which justify the formation of the assertion expressed are actionable.

D.C. United literally did not have any basis to suggest that Plaintiff is a misogynist. "The actual upright OK hand gesture, even when construed in the obscure, new, and alternative meaning, is not known to be associated with misogyny." Complaint ¶ 89, JA15. "Reade Whitney has never supported misogyny." Complaint ¶ 90, JA15. "Reade Whitney is mortified that any of his women friends and coworkers may now believe that he was harboring hateful, misogynistic, or discriminatory thoughts." Complaint ¶ 115, JA17.

These are wholesale falsehoods, published on the internet by a major league sports team, and they are provable. For example, Reade Whitney could be an avowed homophobe, could have published articles or letters premised on an openly anti-gay ideology, or otherwise openly embrace discrimination against homosexuals. Presumably the current leaders of the KKK, the Aryan Brotherhood, and the American Nazi Party would quickly and proudly acknowledge their beliefs. D.C. United conflates potential difficulty of proof with unverifiability, and then asked the District Court to make the same error.

In its memorandum opinion, the District Court only addressed this final sentence of the statement, which is half of the basis for the defamation claims, in a single footnote. JA92. The District Court characterized the statement only "as an articulation of D.C. United's general values…." But the placement of this final sentence immediately after the false sentence that the termination of the head athletic trainer was the result of the "discovery" of "discriminatory hand gesture" is of course to associate them. A published three-sentence statement cannot disassociate the third sentence, and certainly not under the ordinary requirement to construe a complaint "liberally" and in the plaintiff's favor. *Barr v. Clinton*, 370 F.3d 1196, 1199 (D.C. Cir. 2004). And as published, the statement reads as an example of D.C. United not tolerating "any acts of this nature" by terminating the employee who purportedly engaged in such acts. Plainly, the District Court failed to grant the plaintiff the benefit of all inferences that can be derived from the facts alleged.

26

In the same footnote, the District Court noted, "to the extent that statement implies anything about Whitney's use of the hand gesture in a photograph, Whitney does not explain how a statement that implies the gesture is homophobic or misogynistic is any less a nonactionable opinion than the statement that it is discriminatory or racist." Not everything is an opinion. Claiming an apple tastes like a banana would be an opinion. Calling an apple a banana is false. As alleged, the upside-down and backwards OK gesture does not signal racism, and even the ordinary, right-side up, and front facing OK gesture has never signaled homophobia or misogyny. These are wholesale fabrications.

There is a final, independent, and obvious reason that the statements in this case are actionable. One of the four defamation per se categories are words "which prejudice such person in his or her profession or trade." *Fleming v. Moore*, 221 Va. 884, 891 (1981). The Supreme Court of Virginia analyzed a case where the trial court had found that an accusation of racism was defamatory per se to a plaintiff in his profession. "Fleming charged Moore with not wanting blacks to reside within sight of his home, but the allegation of racism was not made in the context of Moore's employment as a teacher." *Id.* So, the Court ultimately reversed because the claim was outside the context of, and not necessarily hurtful in, the plaintiff's profession. *Id.* at 894.

But the allegations in the instant Complaint would have comfortably cleared the racism bar to the Court in *Fleming*. First, here the photo was one of Reade Whitney at work. Complaint ¶¶ 28-29, JA8. The staffers are depicted wearing uniforms. Complaint ¶ 32, JA8. This was a staff photo shoot taken by Defendant and posted by Defendant. Complaint ¶¶ 28-29, JA8.

Second, the accusation of making a "discriminatory hand gesture" and direct implications of racism and discrimination are necessarily hurtful to Reade Whitney in his profession and trade. His extensive training, credentials, and experience is in athletic training and sports medicine. Complaint ¶¶ 9-17, JA6-7. Major League Soccer is the most diverse professional sports league in North America, where approximately 24% of Major League Soccer players are Black or African American, approximately 31% of Major League Soccer players are Hispanic or Latino, and a majority of the athletes that Reade Whitney provides hands on care, therapy, and nutritional and exercise advice to, are racial minorities. Complaint ¶¶ 18-21, JA7.

Through mid-July of 2023, at the age of 37, Reade Whitney was enjoying his trade and profession and looking forward to another three decades of professional level athletic training in soccer. Complaint ¶ 27, JA7. False statements that he made a "discriminatory hand gesture" and implications of trafficking in unarticulated acts of racism and discrimination are necessarily hurtful to him in his profession and trade, and constitutes defamation per se. The Complaint expressly alleged that he is

28

not employable in his given trade and profession because his reputation has been destroyed by D.C. United.  JA 22.

**D.     The statements are actionable under District of Columbia law.**

D.C. United relied heavily upon *Florio v. Gallaudet Univ*., 119 F.4th 67 (2024), which affirmed a 2022 trial court ruling.  The District Court stated that it found *Florio* instructive and attempted to follow it when addressing the fact pattern in this case.  JA90.

In *Florio*, a defendant's statement that a fraternity had become the "face of systemic racism" was regarded as an opinion.  The trial court found that the statement was "her 'subjective view' or 'interpretation' of the fallout from the reappearance of the salute photo on social media and the controversy over the robes. The phrase 'face of' connotes an inherently subjective assessment and is the sort of 'imaginative expression' and 'rhetorical hyperbole' that typifies non-actionable opinion." *Id*.  But the instant case is completely distinguishable on the facts.

In *Florio*, a fraternity had continued to use an obviously Nazi-like Bellamy salute for some 50 years after the federal government replaced it with hand over heart for the pledge of allegiance.  *Id*. at 71.  A photo was taken of four fraternity members in the late 1980's using the by then decades suspect Bellamy salute.  *Id*. The photo publicly surfaced in 2016, declarations were made, and then the photo resurfaced in 2020, garnering renewed attention.  *Id*.  There were issues concerning

29

whether the fraternity would start to again use ceremonial hooded robes, which presumably resembled the well-known KKK outfits. *Id*. There was an investigation. *Id*. The fraternity was suspended for violating a university ban on hooded robes. *Id*. There was thus a series of events, within a university community, over a long period of time. There was much to comment on, much to opine about, and the defendant there did so. In other words, there was plenty of room for subjective assessment.

The Complaint here is almost the converse of *Florio* in a few ways. Regarding the okay gesture, as published by the Anti-Defamation League, "Today, in a usage that dates to at least as early as 17th century Great Britain, it most commonly signals understanding, consent, approval or well-being." Complaint ¶ 66, JA12. According to the Anti-Defamation League, "Since the early 1800s, the gesture increasingly became associated with the word 'okay' and its abbreviation 'ok.'" Complaint ¶ 67, JA13. According to the Anti-Defamation League, "Use of the okay symbol in most contexts is entirely innocuous and harmless." Complaint ¶ 70, JA13. Only recently, and few know of it, has an alternate, nefarious meaning been associated with the OK gesture. Complaint ¶ 71-72, JA13. Where the well-pled allegations are that the OK symbol is entirely innocuous and harmless in most contexts, and where the traditional OK symbol is literally nowhere to be found in the staff photo, there is no space for opinion.

30

In contrast, in *Florio* the salute had been widely known as suspect for 50 years. In *Florio*, the defendant could opine that the plaintiffs had become the faces of racism over a long period of time. Moreover, as framed by this Court in *Florio*:

> the Post reported that the students in the photograph had performed an "apparent Nazi salute." Id. at 56-57. These statements are opinions based on facts not provably false. The parties agree that a Bellamy salute and a Nazi salute are at least similar in appearance. Id. at 22. In fact, the alumni do not identify any difference between them.

*Id*. 78.

While *Florio* involved a comparison between a Bellamy salute and a Nazi salute, apparently indistinguishable from one another, the well-pled facts here are clearly distinguishable. Here, the already overwhelmingly innocuous OK sign was upside down, backwards, and below the waist instead of held at chest or eye level. Objectively there was never a discriminatory gesture made by Reade Whitney in the staff photo. No fact witness or expert witness could ever testify to the contrary. *Florio* does prove any obstacle to the facts of this case.

Here, Reade Whitney had been playing the Circle Game in the photograph, which is a schoolyard game dating back to at least the 1970s that involves the upside-down okay hand gesture held below waist level. Complaint ¶ 75, JA14. As published by the Anti-Defamation League, because of the obscurity and newness of an alternative meaning, the overwhelming usage of the "okay" hand gesture today is still its traditional purpose as a gesture signifying assent or approval. JA-13-14. As

31

a result, someone who uses the symbol cannot be assumed to be using the symbol in either a trolling or, especially, white supremacist context unless other contextual evidence exists to support the contention. Complaint ¶ 73, JA13.

The hand gesture used by Reade Whitney in the staff photograph is literally not the traditional OK gesture that could, as of 2019, be obscurely construed as standing for white power but was instead an upside-down and backwards gesture. Complaint ¶ 78, JA14. The hand gesture here was specifically held below the waist, which is consistent with the decades old Circle Game. Complaint ¶ 79, JA14. These well-pled allegations are all factual in nature and would be akin to a thumbs up versus thumbs down gesture communicating differing messages.

D.C. United asked Reade Whitney about the hand sign, it was not known to him nor used as a discriminatory gesture, and D.C. United had absolutely no evidence whatsoever to the contrary. Complaint ¶¶ 36, 40-42, 63, 75-93, 95-98, JA9, 12, 14-15. In other words, there was nothing to opine about. Either it was a discriminatory gesture or not. And literally the orientation, the denial of knowledge, and the absence of any evidence that the gesture was, in fact, discriminatory did not create an opportunity to opine, much less in a statement published on the internet by a major league sports team. There is not a single subjective element about the fact that the upside-down, backwards, and below the waist version of the OK sign is not the one that has developed an alternative, albeit obscure, meaning. In other words, the issue is not whether this was the innocuous OK sign or the obscure white power

32

sign. The issue is whether the gesture was the same "discriminatory gesture" at all. And it is not. There is no place for the "inherently subjective assessment" that this Court discussed in *Florio* and which led the District Court below astray.

There is another District of Columbia case which deals with the OK sign and which illustrates exactly how the instant Complaint is actionable. In *Fairbanks v. Roller*, 314 F. Supp. 3d 85 (D.C. Cir. 2018), the plaintiff was a journalist who released on the web a photo of herself with another journalist in the press room at the White House making the OK sign. *Id.* 88. The defendant, who also was a journalist, retweeted the photo and captioned it "just two people doing a white power hand gesture in the White House." *Id*. The plaintiff sued for defamation. Defendant argued that the statement was opinion and otherwise not actionable. The Court clarified the analysis that directly applies under the facts presented in the instant Complaint and the attack upon it that persuaded the District Court.

> Ms. Roller's argument about the first *Ollman* factor depends on the mistaken assumption that it is impossible to make a clear statement about an ambiguous gesture. A simple illustration shows the flaw in this logic: People wave in greeting and in parting, but the ambiguity of the gesture does not make the sentence "she waved goodbye" ambiguous or indefinite. Ms. Roller's argument about the second *Ollman* factor relies almost entirely on analogies to statements in other cases about plaintiffs' views or attitudes but does not address the fact that views and attitudes are subjective realities while physical gestures are objective realities.

*Id*. at 91. Exactly. Physical gestures are objective realities.

33

Just as the ambiguity of a person waving does not make "she waved goodbye" ambiguous, D.C. United stating that Reade Whitney made a discriminatory hand gesture is not an opinion when there is no such ambiguity.

> Her argument about the third *Ollman* factor suggests that readers would not infer false facts from her tweet but does not address whether her tweet makes a false factual statement directly. … One can imagine situations in which a defendant's characterization of a plaintiff's gesture would be arguably defamatory. For example, a defendant might claim that the plaintiff "flipped me off" when the evidence showed the plaintiff actually gave a thumbs-up, or a defendant might claim that the plaintiff performed the Nazi salute when the plaintiff merely waved hello. These demonstrably false factual statements would differ from related, but protected, statements of opinion such as, "She is a vulgar person," or "He is a Nazi-lover." *Cf. Buckley v. Littell*, 539 F.2d 882, 893-94 (2d Cir. 1976) (distinguishing the factual allegation that a plaintiff was a member of the Communist Party from the statement of opinion that plaintiff is "a fellow traveler of fascism"); *Smith v. Sch. Dist. of Phila.*, 112 F. Supp. 2d 417, 429 (E.D. Pa. 2000) (holding that general accusations of being "racist and anti-Semitic" state opinion and not fact). While the allegation that Ms. Fairbanks displayed a "white power gesture" is arguably more ambiguous than an allegation that the plaintiff flipped someone off or performed the Nazi salute, this ambiguity is not clearly fatal to her suit against Ms. Roller.

*Id*. 91-92. There are no existing facts which could prove fatal to Reade Whitney's valid claim for defamation here.

The District Court's opinion did not address *Fairbanks* or even mention it. Nor could it have, as the dismissal of the Complaint here and the application of *Fairbanks* cannot be reconciled.

34

**E.    The comparable jurisprudence supports actionable defamation.**

D.C. United selectively cited cases from other jurisdictions to claim that their published statements were merely opinion.  The various cases are largely either fact patterns where genuinely subjective opinions are rendered, or cases which conflate the difficulty of proving state of mind in some contexts with impossibility of doing so, or both.  As exposed in *Fairbanks*, that line of reasoning is deeply flawed.  Just as importantly, these cases generally deal with the pure use of a label such as "racist" and not a demonstrative action such as using a purported discriminatory gesture.

The District Court only cited one such case in its opinion, *Cooper v. Templeton*, 629 F. Supp. 3d 223 (2022), which D.C. United relied upon heavily in their briefing.  But the facts in *Cooper* are meaningfully different than here.  The circumstances and the language employed were both materially different.

First, in *Cooper*, the statement at issue was made by the defendant after the underlying video had been publicly released, circulated widely, and had been subject to much commentary.

> Nothing about Defendants' May 26 Statement suggested that the opinions contained therein rested on facts undisclosed to the audience. Defendants' words, on their face, did not indicate or even imply that they considered any information not already known to the public, or sources not available to the public, in conducting their "internal review" of the incident. A consideration of the circumstances surrounding the statement further underscores that notion. Plaintiff acknowledges that the video of her encounter with Mr. Cooper became "international news as a racial flashpoint."
>
> ….

35

> The contents of the viral video, as well as the dialogue surrounding it both in the media and on social media, were already matters of public knowledge when Defendants' May 26 tweet was posted. *See Gisel v. Clear Channel Commc'ns, Inc.*, 94 A.D.3d 1525, 1526, 942 N.Y.S.2d 751 (N.Y. App. Div. 2012) ("Because Lonsberry's statements were based on facts that were widely reported by Western New York media outlets and were known to his listeners, it cannot be said that his statements were based on undisclosed facts."). Because Defendants' statement did not imply the existence of undisclosed facts—rather, a reasonable reader would have understood it to be based on widely disseminated facts in the public domain—it is protected as pure opinion.

*Id*. at 236.

Here, the staff photo had been published only by D.C. United itself, just one day before, the photo was not subject to widespread attention until after the press release of July 21, 2023, and the press release failed to include the photo. JA8-12. In other words, the vast majority of readers of the press release would only see D.C. United's false statement that they had discovered a discriminatory gesture made by Reade Whitney, without the photo itself or any other context. That is a radical difference in the facts. Here, there is an implication of facts unknown to the audience. This is further illustrated in the Complaint through at least six of the public comments appended to the Washington Post article. JA11.

Second, unlike in *Cooper*, there was not solely a reference to an internal review, but "[t]his termination is the result of an internal review following the discovery of a discriminatory hand gesture made by the individual that surfaced in a photograph published across social media platforms on July 20, 2023." JA10.

36

Claiming that a discriminatory hand gesture was "discovered" is a factual assertion. It cannot be brushed off as a non-actionable opinion. A miner either discovered gold or he discovered pyrite, but the assertion of one over the other is a factual assertion.

At minimum, under New York law as articulated in *Cooper* which is very similar to Virginia and District of Columbia law, the statement by D.C. United would have to be regarded as mixed opinion, meaning "a statement that 'implies that it is based upon facts which justify the opinion but are unknown to those reading or hearing it.'" *Id*. at 235, quoting *Steinhilber v. Alphonse*, 68 N.Y.2d 283, 289 (1986). That is exactly the case here.

There are also plenty of cases where, like in Virginia, topics related to racism are not prohibitive of a defamation claim. A relatively recent case where implications of unstated facts surrounding claims of false statements of racism (which is a far less robust fact pattern than this case) was allowed to proceed.

> Given the public's lack of knowledge of what had happened at the bakery and the ongoing tension on campus about racial injustice, these statements would convey to a reasonable reader that the arrest and alleged assault at the bakery were racially motivated, that the Gibsons had a verifiable history of racially profiling shoplifters on that basis for years, and that those facts were a reason to boycott the bakery. The trial court did not err in concluding, as a matter of law, that these were actionable statements of fact, not constitutionally protected opinion. Consequently, it did not err in denying Oberlin's motion for JNOV on this basis.

*Gibson Bros. v. Oberlin Coll*., 2022-Ohio-1079, P37.

37

Oberlin broadly defines the controversy in this case to be what it alleges is a history of racism at the bakery.  The proper focus of this inquiry, however, is on the controversy from which the alleged defamation arose: the incident at the bakery on November 9, 2016.  *See Woods v. Capital Univ.*, 10th Dist. Franklin No. 09AP-166, 2009-Ohio-5672, ¶ 36.  The Gibsons did not voluntarily inject themselves into a shoplifting incident at their bakery, nor did they voluntarily inject themselves into extreme public criticism of their employee's efforts to apprehend and detain the shoplifter.  Oberlin has failed to demonstrate that the trial court erred in concluding, as a matter of law, that the Gibsons were private figures

*Gibson Bros. v. Oberlin Coll.*, 2022-Ohio-1079, P61.

Also illustrative, in October of 2024, the Superior Court of Delaware's denial of a defendant's motion to dismiss in the notorious Kansas City Chiefs fan defamation controversy shows the correct application of this area of the law. *Armenta v. G/O Media, Inc.*, No.: N24C-02-051 SPL, 2024 Del. Super. LEXIS 675 (Super. Ct. Oct. 7, 2024).  The facts in the *Armenta* case have many similarities to the instant case.  In *Armenta*, a media company by the name of Deadspin published an image of a child displaying his team spirit in support of the Kansas City Chiefs during a football game at the team's home stadium.  *Id.*  To support his team, the 9-year-old child fan wore a team jersey, a Native American headdress, and had painted one half of his face red and the other black.  *Id.*  During the game, a television broadcast focused on the child fan for approximately 3 seconds before panning to others in the stadium.  *Id.*  Soon after, still image captures of the television broadcast circulated online.  *Id.*  The following day, the media company, Deadspin, published

an article with one of these still image captures of the broadcast, describing the child as "wearing 'Black face'" in a display of racial animus toward African Americans and "Native headdress" to display his hatred toward Native American people. The article further surmised that "Raul and Shannon Armenta, H.A.'s parents, taught H.A. that hatred." *Id.*

Unsurprisingly, given the shocking and misleading accusation made in a national publication, the Armenta family sued Deadspin for defamation. *Id.* Deadspin moved to dismiss the case for failing to state a claim for which relief could be granted, contending that the article contained an expression of opinion, and that their undeniably defamatory claim was insulated from any relief sought by the Armenta family. *Id.* at *2.

Applying a totality of the circumstances test under California law (*id*. at *13) the Court explained:

> For the statement to be defamatory, it must be "understood in a defamatory sense." Where the indicia of an opinion piece are present, "readers can be expected to discount the statements made in that context as more likely to be the stuff of opinion than fact." Courts must consider "the nature and full content of the communication and the knowledge and understanding of the audience to whom the publication was directed."

*Id.*

Using this analysis, the Court determined that a reasonable fact finder could indeed conclude that the published statement declared or implied a provably false

39

assertion of fact and that "[s]tatements expressed as opinions […] do not 'enjoy blanket constitutional protection' because 'expressions of 'opinion' may often imply an assertion of objective fact.'" *Id.* at *12-13.

The District Court adopted D.C. United's argument that their press release announcing the "discovery of a discriminatory hand gesture" Reade Whitney supposedly made, accompanied by a subsequent paragraph denouncing "racism, homophobia, misogyny, or discrimination of any kind," as well as a note that "D.C. United do not tolerate any acts of this nature," should be given expansive insulation from any liability as purely an expression of opinion. That is not the standard under the law of any jurisdiction.

Like in *Armenta*, D.C. United seeks to argue that its public statements alleging that Reade Whitney displayed a discriminatory hand gesture are nonactionable for the same reasons that calling him racist could arguably be non-actionable. However, there is a cardinal and legally significant distinction between a statement calling someone a racist (which is still provable) and a statement accusing someone of engaging in racist conduct. As noted above, expressions of opinion are not protected if they imply an assertion of an objective, defamatory fact. *See Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18 (1990); *Williams v. Garraghty*, 249 Va. 224, 233 (1995); *Raytheon Tech. Servs. Co. v. Hyland*, 273 Va. 292, 303 (2007). *See also White v. Fraternal Ord. of Police,* 909 F.2d 512, 518, 285 U.S. App. D.C. 273 (D.C. Cir. 1990).

Ultimately, the implication from "D.C. United do not tolerate any acts of this nature," is that Reade Whitney has engaged in discriminatory acts in addition to the purported discriminatory hand gesture.

**CONCLUSION**

The District Court erred by dismissing the well-pled Complaint filed by Reade Whitney. The Complaint plausibly and adequately stated a defamation claim, whether considered under Virginia or District of Columbia law. The District Court erred by concluding that D.C. United's statements were protected opinions. The District Court erred by concluding that D.C. United's statements were opinions and not factual statements. The District Court erred by concluding that the statements were not actionable opinions which implied a provably false fact.

This Court's opinion in *Florio* ultimately does not serve to undermine Reade Whitney's straightforward claims of defamation. Crucially, this Court's logic and reasoning in *Fairbanks* demonstrates exactly why the Complaint pleads prima facie claims of defamation, because "views and attitudes are subjective realities while physical gestures are objective realities." *Fairbanks v. Roller*, 314 F. Supp. 3d 85, at 91 (2018).

Reade Whitney has actionable and robust defamation claims. He respectfully asks this Court to reverse the dismissal of his Complaint, remand his case to District Court, and allow him to present his case to a jury.

41

Respectfully Submitted,

*/s/ Mikhael D. Charnoff*
Mikhael D. Charnoff
CHARNOFF SIMPSON PLLC
111 Church Street NW, Suite 202A
Vienna, Virginia 22180
(703) 291-6650
mike@charnoffsimpson.com

*Counsel for Plaintiff-Appellant*

## CERTIFICATE OF COMPLIANCE

This document complies with the word limit requirement set forth in FRAP 27(d)(2) because, excluding the exemptions under Fed. R. App. P. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments), it contains <u>10,276 words</u>.

This document complies with the typeface requirements set forth in FRAP 27(d)(1)(E) because it has been prepared in a proportional spaced typeface using Microsoft Word in <u>14 point Times New Roman</u>.

Respectfully Submitted,

<u>*/s/ Mikhael D. Charnoff*</u>
Mikhael D. Charnoff
CHARNOFF SIMPSON PLLC
111 Church Street NW, Suite 202A
Vienna, Virginia 22180
(703) 291-6650
mike@charnoffsimpson.com

*Counsel for Plaintiff-Appellant*

## CERTIFICATE OF FILING AND SERVICE

I HEREBY CERTIFY that on May 11, 2026, a true copy of the foregoing was filed using the CM/ECF system, which will then send notification of such filing to all counsel of record.

Respectfully Submitted,

*/s/ Mikhael D. Charnoff*
Mikhael D. Charnoff
CHARNOFF SIMPSON PLLC
111 Church Street NW, Suite 202A
Vienna, Virginia 22180
(703) 291-6650
mike@charnoffsimpson.com

*Counsel for Plaintiff-Appellant*

# ADDENDUM

**TABLE OF CONTENTS**

28 U.S.C. § 1332 ........................................................................Add. 1

28 U.S.C. § 1291 ........................................................................Add. 5

Federal Rules of Civil Procedure – Rule 12(b)(6) .............................................Add. 5

Add. i

## ADDENDUM

## STATUTES AND REGULATIONS

### 28 U.S.C. § 1332

(a) The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between—
(1) Citizens of different States;
(2) citizens of a State and citizens or subjects of a foreign state, except that the district courts shall not have original jurisdiction under this subsection of an action between citizens of a State and citizens or subjects of a foreign state who are lawfully admitted for permanent residence in the United States and are domiciled in the same State;
(3) citizens of different States and in which citizens or subjects of a foreign state are additional parties; and
(4) a foreign state, defined in section 1603(a) of this title [28 USCS § 1603(a)], as plaintiff and citizens of a State or of different States.
(b) Except when express provision therefor is otherwise made in a statute of the United States, where the plaintiff who files the case originally in the Federal courts is finally adjudged to be entitled to recover less than the sum or value of $75,000, computed without regard to any setoff or counterclaim to which the defendant may be adjudged to be entitled, and exclusive of interest and costs, the district court may deny costs to the plaintiff and, in addition, may impose costs on the plaintiff.
(c) For the purposes of this section and section 1441 of this title [28 USCS § 1441]—
(1) a corporation shall be deemed to be a citizen of every State and foreign state by which it has been incorporated and of the State or foreign state where it has its principal place of business, except that in any direct action against the insurer of a policy or contract of liability insurance, whether incorporated or unincorporated, to which action the insured is not joined as a party-defendant, such insurer shall be deemed a citizen of—
(A) every State and foreign state of which the insured is a citizen;
(B) every State and foreign state by which the insurer has been incorporated; and
(C) the State or foreign state where the insurer has its principal place of business; and

Add. 1

(2) the legal representative of the estate of a decedent shall be deemed to be a citizen only of the same State as the decedent, and the legal representative of an infant or incompetent shall be deemed to be a citizen only of the same State as the infant or incompetent.

(d)

(1) In this subsection—

(A) the term "class" means all of the class members in a class action;

(B) the term "class action" means any civil action filed under rule 23 of the Federal Rules of Civil Procedure or similar State statute or rule of judicial procedure authorizing an action to be brought by 1 or more representative persons as a class action;

(C) the term "class certification order" means an order issued by a court approving the treatment of some or all aspects of a civil action as a class action; and

(D) the term "class members" means the persons (named or unnamed) who fall within the definition of the proposed or certified class in a class action.

(2) The district courts shall have original jurisdiction of any civil action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and is a class action in which—

(A) any member of a class of plaintiffs is a citizen of a State different from any defendant;

(B) any member of a class of plaintiffs is a foreign state or a citizen or subject of a foreign state and any defendant is a citizen of a State; or

(C) any member of a class of plaintiffs is a citizen of a State and any defendant is a foreign state or a citizen or subject of a foreign state.

(3) A district court may, in the interests of justice and looking at the totality of the circumstances, decline to exercise jurisdiction under paragraph (2) over a class action in which greater than one-third but less than two-thirds of the members of all proposed plaintiff classes in the aggregate and the primary defendants are citizens of the State in which the action was originally filed based on consideration of—

(A) whether the claims asserted involve matters of national or interstate interest;

(B) whether the claims asserted will be governed by laws of the State in which the action was originally filed or by the laws of other States;

(C) whether the class action has been pleaded in a manner that seeks to avoid Federal jurisdiction;

(D) whether the action was brought in a forum with a distinct nexus with the class members, the alleged harm, or the defendants;

(E) whether the number of citizens of the State in which the action was originally filed in all proposed plaintiff classes in the aggregate is substantially larger than the number of citizens from any other State, and the citizenship of the other members of the proposed class is dispersed among a substantial number of States; and

(F) whether, during the 3-year period preceding the filing of that class action, 1 or more other class actions asserting the same or similar claims on behalf of the same or other persons have been filed.

(4) A district court shall decline to exercise jurisdiction under paragraph (2)—

(A)

(i) over a class action in which—

(I) greater than two-thirds of the members of all proposed plaintiff classes in the aggregate are citizens of the State in which the action was originally filed;

(II) at least 1 defendant is a defendant—

(aa) from whom significant relief is sought by members of the plaintiff class;

(bb) whose alleged conduct forms a significant basis for the claims asserted by the proposed plaintiff class; and

(cc) who is a citizen of the State in which the action was originally filed; and

(III) principal injuries resulting from the alleged conduct or any related conduct of each defendant were incurred in the State in which the action was originally filed; and

(ii) during the 3-year period preceding the filing of that class action, no other class action has been filed asserting the same or similar factual allegations against any of the defendants on behalf of the same or other persons; or

(B) two-thirds or more of the members of all proposed plaintiff classes in the aggregate, and the primary defendants, are citizens of the State in which the action was originally filed.

(5) Paragraphs (2) through (4) shall not apply to any class action in which—

(A) the primary defendants are States, State officials, or other governmental entities against whom the district court may be foreclosed from ordering relief; or

(B) the number of members of all proposed plaintiff classes in the aggregate is less than 100.

(6) In any class action, the claims of the individual class members shall be aggregated to determine whether the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs.

(7) Citizenship of the members of the proposed plaintiff classes shall be determined for purposes of paragraphs (2) through (6) as of the date of filing of the complaint or amended complaint, or, if the case stated by the initial pleading is not subject to Federal jurisdiction, as of the date of service by

Add. 3

plaintiffs of an amended pleading, motion, or other paper, indicating the existence of Federal jurisdiction.

(8) This subsection shall apply to any class action before or after the entry of a class certification order by the court with respect to that action.

(9) Paragraph (2) shall not apply to any class action that solely involves a claim—

(A) concerning a covered security as defined under [section] 16(f)(3) of the Securities Act of 1933 (15 U.S.C. 78p(f)(3) [15 USCS § 77p(f)(3)]) and section 28(f)(5)(E) of the Securities Exchange Act of 1934 (15 U.S.C. 78bb(f)(5)(E));

(B) that relates to the internal affairs or governance of a corporation or other form of business enterprise and that arises under or by virtue of the laws of the State in which such corporation or business enterprise is incorporated or organized; or

(C) that relates to the rights, duties (including fiduciary duties), and obligations relating to or created by or pursuant to any security (as defined under section 2(a)(1) of the Securities Act of 1933 (15 U.S.C. 77b(a)(1)) and the regulations issued thereunder).

(10) For purposes of this subsection and section 1453 [28 USCS § 1453], an unincorporated association shall be deemed to be a citizen of the State where it has its principal place of business and the State under whose laws it is organized.

(11)

(A) For purposes of this subsection and section 1453 [28 USCS § 1453], a mass action shall be deemed to be a class action removable under paragraphs (2) through (10) if it otherwise meets the provisions of those paragraphs.

(B)

(i) As used in subparagraph (A), the term "mass action" means any civil action (except a civil action within the scope of section 1711(2) [28 USCS § 1711(2)]) in which monetary relief claims of 100 or more persons are proposed to be tried jointly on the ground that the plaintiffs' claims involve common questions of law or fact, except that jurisdiction shall exist only over those plaintiffs whose claims in a mass action satisfy the jurisdictional amount requirements under subsection (a).

(ii) As used in subparagraph (A), the term "mass action" shall not include any civil action in which—

(I) all of the claims in the action arise from an event or occurrence in the State in which the action was filed, and that allegedly resulted in injuries in that State or in States contiguous to that State;

(II) the claims are joined upon motion of a defendant;

Add. 4

(III) all of the claims in the action are asserted on behalf of the general public (and not on behalf of individual claimants or members of a purported class) pursuant to a State statute specifically authorizing such action; or

(IV) the claims have been consolidated or coordinated solely for pretrial proceedings.

(C)

(i) Any action(s) removed to Federal court pursuant to this subsection shall not thereafter be transferred to any other court pursuant to section 1407 [28 USCS § 1407], or the rules promulgated thereunder, unless a majority of the plaintiffs in the action request transfer pursuant to section 1407 [28 USCS § 1407].

(ii) This subparagraph will not apply—

(I) to cases certified pursuant to rule 23 of the Federal Rules of Civil Procedure; or

(II) if plaintiffs propose that the action proceed as a class action pursuant to rule 23 of the Federal Rules of Civil Procedure.

(D) The limitations periods on any claims asserted in a mass action that is removed to Federal court pursuant to this subsection shall be deemed tolled during the period that the action is pending in Federal court.

(e) The word "States", as used in this section, includes the Territories, the District of Columbia, and the Commonwealth of Puerto Rico.

## 28 U.S.C. § 1291

The courts of appeals (other than the United States Court of Appeals for the Federal Circuit) shall have jurisdiction of appeals from all final decisions of the district courts of the United States, the United States District Court for the District of the Canal Zone, the District Court of Guam, and the District Court of the Virgin Islands, except where a direct review may be had in the Supreme Court. The jurisdiction of the United States Court of Appeals for the Federal Circuit shall be limited to the jurisdiction described in sections 1292(c) and (d) and 1295 of this title [28 USCS §§ 1292(c) and (d) and 1295].

## Federal Rules of Civil Procedure – Rule 12(b)(6)

(a) Time to Serve a Responsive Pleading. Unless another time is specified by a federal statute, the time for serving a responsive pleading is as follows:

(1) In General.

(A) A defendant must serve an answer:

(i) within 21 days after being served with the summons and complaint; or

Add. 5

(ii) if it has timely waived service under Rule 4(d), within 60 days after the request for a waiver was sent, or within 90 days after it was sent to the defendant outside any judicial district of the United States.

(B) A party must serve an answer to a counterclaim or crossclaim within 21 days after being served with the pleading that states the counterclaim or crossclaim.

(C) A party must serve a reply to an answer within 21 days after being served with an order to reply, unless the order specifies a different time.

(2) United States and Its Agencies, Officers, or Employees Sued in an Official Capacity. The United States, a United States agency, or a United States officer or employee sued only in an official capacity must serve an answer to a complaint, counterclaim, or crossclaim within 60 days after service on the United States attorney.

(3) United States Officers or Employees Sued in an Individual Capacity. A United States officer or employee sued in an individual capacity for an act or omission occurring in connection with duties performed on the United States' behalf must serve an answer to a complaint, counterclaim, or crossclaim within 60 days after service on the officer or employee or service on the United States attorney, whichever is later.

(4) Effect of a Motion. Unless the court sets a different time, serving a motion under this rule alters these periods as follows:

(A) if the court denies the motion or postpones its disposition until trial, the responsive pleading must be served within 14 days after notice of the court's action; or

(B) if the court grants a motion for a more definite statement, the responsive pleading must be served within 14 days after the more definite statement is served.

(b) How to Present Defenses. Every defense to a claim for relief in any pleading must be asserted in the responsive pleading if one is required. But a party may assert the following defenses by motion:

(1) lack of subject-matter jurisdiction;

(2) lack of personal jurisdiction;

(3) improper venue;

(4) insufficient process;

(5) insufficient service of process;

(6) failure to state a claim upon which relief can be granted; and

(7) failure to join a party under Rule 19.

A motion asserting any of these defenses must be made before pleading if a responsive pleading is allowed. If a pleading sets out a claim for relief that does not require a responsive pleading, an opposing party may assert at trial

Add. 6

any defense to that claim. No defense or objection is waived by joining it with one or more other defenses or objections in a responsive pleading or in a motion.

(c) Motion for Judgment on the Pleadings. After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings.

(d) Result of Presenting Matters Outside the Pleadings. If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion.

(e) Motion for a More Definite Statement. A party may move for a more definite statement of a pleading to which a responsive pleading is allowed but which is so vague or ambiguous that the party cannot reasonably prepare a response. The motion must be made before filing a responsive pleading and must point out the defects complained of and the details desired. If the court orders a more definite statement and the order is not obeyed within 14 days after notice of the order or within the time the court sets, the court may strike the pleading or issue any other appropriate order.

(f) Motion to Strike. The court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter. The court may act:

(1) on its own; or

(2) on motion made by a party either before responding to the pleading or, if a response is not allowed, within 21 days after being served with the pleading.

(g) Joining Motions.

(1) Right to Join. A motion under this rule may be joined with any other motion allowed by this rule.

(2) Limitation on Further Motions. Except as provided in Rule 12(h)(2) or (3), a party that makes a motion under this rule must not make another motion under this rule raising a defense or objection that was available to the party but omitted from its earlier motion.

(h) Waiving and Preserving Certain Defenses.

(1) When Some Are Waived. A party waives any defense listed in Rule 12(b)(2)–(5) by:

(A) omitting it from a motion in the circumstances described in Rule 12(g)(2); or

(B) failing to either:

(i) make it by motion under this rule; or

Add. 7

(ii) include it in a responsive pleading or in an amendment allowed by Rule 15(a)(1) as a matter of course.

(2) When to Raise Others. Failure to state a claim upon which relief can be granted, to join a person required by Rule 19(b), or to state a legal defense to a claim may be raised:

(A) in any pleading allowed or ordered under Rule 7(a);

(B) by a motion under Rule 12(c); or

(C) at trial.

(3) Lack of Subject-Matter Jurisdiction. If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action.

(i) Hearing Before Trial. If a party so moves, any defense listed in Rule 12(b)(1)–(7)—whether made in a pleading or by motion—and a motion under Rule 12(c) must be heard and decided before trial unless the court orders a deferral until trial.

Add. 8